*25 The opinion of Mr. Justice Hoffman, upon some of the leading questions arising on the trial, is as follows:—
Hoffmaft, J.
It appears to me that the steadiest lights by which I can trace my way through the difficulties of this important case, will be to examine it under the following heads:—■
I. The question of jurisdiction.
II. The rights and position of Petrus Stuyvesant, father of Nicholas William and Peter G. Stuyvesant, as owner of the shore, prior to his death, in 1805.
III. The rights and position of Nicholas W. and of Peter G. Stuyvesant, under the will of their father after his death, in 1805, and before the statute of the 3d of April, 1807.
IV. The rights and acts of the same parties, or their grantees, after the passage of the Act of 1807, and before the Act of April 13, 1826.
V. The rights of the same parties, or their grantees, after the Act of 1826, and prior to the Act of the 11th May, 1835.
VI. And lastly, their rights as affected by the Statute of 1835, and the consequent ordinances of the corporation.
[I. The objection to the jurisdiction not being made a point at General Term, the observations of the Judge are omitted.]
II. Before and at the period of the death of Petrus Stuyvesant, in 1805, the Corporation of New York, under the charters of 1686 and of 1730, owned in fee the whole strip of land between high and low water, around the island of New York, with exceptions not important to be here noticed. Mr. Field has described this strip as the tide-way. Counsel have generally adopted it; and the phrase will be so employed in this opinion.
I consider, that it does not now admit of dispute, that the corporation was seized of this tide-way, free from any pre-emptive privilege in any one; that they had absolute power to dispose of it to whom they pleased—at the price they pleased—and without notice to the owners of the shore of their intention.
The cases of Rogers v. Jones, (1 Wendell, 237,) Lansing v. Smith, (4 Wendell, 9,) and of Whitney v. The Mayor, etc., (not reported) with the case of Furman v. The Mayor, etc. in this Court (5 Sandf. R. 16) and in the Court of Appeals, have put the question at rest in our State.
*26 But while such were the absolute strict powers of the corporation, .yet in practice they acted upon the equitable principle, that the adjoining owners were entitled, as a matter of propriety, not of right, to the first privilege. It is on this basis that the subject is placed in a report signed by the present Justice Ingraham, of the Court of Common Pleas, and by the late Edward Taylor, one of the most judicious men who has acted in the councils of the city, made in the year 1837. It related to land, part of the 400 feet, granted in the Charter of 1730. Of course, it applies with equal strength to the tide-way in this location ; and it contains the assertion of a power to take and use the land as the Corporation thought fit, with the recognition of the fairness and honesty of dealing which calls for a proffer of it to the adjacent owner.
The title of Petrus Stuyvesant was derived, in point of fact, from the Dutch government. It must be taken as derived from that government, or from the English. We have no other sources of title in this State. And, treating it as coming from one or the other, the law upon this question is the same.
It results—that prior to the death of Petrus Stuyvesant, he had no right whatever in the land under water in front of his possession on the shore. He had the probable interest of acquiring such a right in preference to others, from the custom of the corporation, and the presumption that it would be adhered to.
His death occurred in 1805, and the title, appointed to his sons by his will of 1802, then took effect.
III. In 1805, then, Peter G. Stuyvesant and Nicholas W. Stuyvesant took the estate under their father, extending on the shore of the East River from below what is now 9th street to 23d street. And the dividing line of the devise to them was the point on the shore where Stuyvesant street touched it. It is sufficient now to say (without adverting to the numerous points taken by counsel about this street) that the will marks it as a line of division. It may, then, for the present be treated as nothing more than a defined boundary line, such as a fence or a row of trees, coming to the shore at high water.
Thus Nicholas W. Stuyvesant had title to all the shore line southward of this point down to the extreme limit near 9th street; and Peter G. Stuyvesant had title to all the land northwardly from the same point to the other extreme limit near 23d street.
*27 And then, also, Nicholas W. possessed the beneficial interest of the presumption that the Corporation would give him the first privilege of acquiring the title to the tide-way adjoining his shore line; and Peter G. had a similar beneficial interest for the extent of his shore line. It is not possible to characterize their privilege as any thing higher.
At that period, viz., between 1805 and 1807, as well as before, the right of the Corporation in relation to the forming of streets stood thus:—
By the Charter of 1686, by the Act of October 9,1691, and the Charter of Montgomery (§ 16), full power was given to establish, appoint and lay out all streets in the City of New York and Manhattan Island. The Act of 1691 was renewed in this particular by a Statute of April 16, 1787. (1 Greenleaf, 441.) A street, therefore, at the line or within the line of low water, could have been made.
Again, the Act of the 3d of April, 1798, contained a clause empowering the corporation, as the buildings of the city should be further extended along the rivers, from time to time to extend and lengthen the said streets and wharves. This enactment was pursuant to a petition of the Corporation, that they might lay out streets of 70 feet in width in front of that part of the city which adjoined the rivers. This act was passed after two ordinances of the Corporation, of great importance, which have never been noticed in the important cases on this subject.
These ordinances established West and South streets by definite lines and bounds, and were accompanied with and based upon maps and surveys now in the office of the street commissioner—South street being laid out up to Corlear’s Hook.
I think that this clause of this, statute was useless, unless it meant to sanction a continuation of South street, beyond Corlear’s Hook, of the same width; but it, of course, could not be laid beyond the limit of 70 feet from the tide-way, though it might be on such extremity, or from point to point within it, as convenience should dictate.
If, then, before 1807, these parties had applied for grants of the tide-way, they could have been issued upon the principle of continuing the line of division as the devisor had designated it for the upland. As matter of absolute power, this is not question *28 able; as matter of consistency with rights on the shore, it would be defensible. Test it by the import of the will. It is that his son Nicholas shall have the land south of-this point, and all the possible benefit of acquiring the tide-way attached to that land; and his son Peter should have a similar right north of that point. The shore line terminates there. The nearest line to the extremity of the tide-way is along this line of Stuyvesant street continued.
Such an apportionment would also have been equitable, as I shall, under another head, attempt to show. If equitable and just, then, without saying that the corporation could not have granted by some other arbitary line, we, at least, may say that a grant according to this line would be a union of legal right with equitable principles.
IV. The next subject of consideration is the right of Peter G. and Nicholas W. Stuyvesant under the Act of April 3, 1807. (Session Laws, 1807, p. 125.)
That statute had two great objects in view. The first, and the principal, was to establish a uniform system of avenues and streets within certain limits; the second was to give to the corporation, for public purposes, the right to certain lands under water.
My consideration of this act leads to the following conclusions
1. The statute itself, and the map made under'it, define the limits and the operation of the act as relates to Streets, to the land along the shore of either river, viz., high water-mark. It did not profess to extend, and did not extend into the rivers below this mark at all; and no rights below such mark were of necessity regulated, in extent or mode of enjoyment, by such statute or map.
The fourth section gave authority to the commissioners to lay out streets, roads and public squares within that part of the city to the northward of a certain point commencing on Hudson River; thence running, in a manner and through streets specified, to the East River. "
By the 8th section, their proceedings and the maps to be made were to be final and conclusive, with respect to persons and lands within the boundaries before mentioned.
The commissioners say, in their “Remarks,” that all the streets (except 1st and 2d streets, which ran into North street) extend *29 eastwardly to the East^ River; and all the streets from 13th street northward extend from river to river, except where they are interrupted by public squares or places.
Upon the map filed under the statute, and as to streets and avenues near the property now in question, the First Avenue was established along the whole shore; Avenue A ran up to a point a little beyond 16th street, and there terminated in the river; Avenue B ran to a point between 13th and 14th streets; Avenue C terminated between 12th and 13th streets, and Avenue D near the south side of 12th street: all in the river.
A market place was laid down to the south of 9th street, which interrupted the lines of these avenues, except the First; but by subsequent statutes, of April 11,1815, and January 22,1824, this was discontinued, and the avenues and streets continued through it. It may also be noticed, that at a point nearly opposite the south end of Blackwell’s Island, Avenue A was resumed, and continued until it ran into Harlem River; and Avenue B was resumed further north, and continued in like manner.
Then, it is plain, that the streets and avenues, in connection with this property, ran into and terminated at the river, and at high water-mark. The office of the commissioners being fulfilled when the map was filed, their powers expired; and the laying out of streets over other ground was left to the authority possessed by the corporation, or to be governed by future legislation. I refer also to the recital in the Act of January 22,1824, (47 Sess. vol. 6. cap. 7,) upon this subject.
It is needless to advert to. the numerous acts in which legislative aid has been obtained, either to vary the map made under the Act of 1807, or to lay out avenues or streets over other property. In the last case, it will be found that resort was had to the Legislature, when the street or avenue was to be run over land still in the State. Such was the case in respect to the 11th and 13th Avenues (act 13th May, 1846; act 12th April, 1837). In the latter act, I notice the express provision for extending the streets from their terminations on the map of 1807, down to the 13th Avenue.
2. It follows from this view, that if the Act of 1807 had not conferred upon the corporation any land under water beyond the tide-way, that body could have made, and could only have made, *30 an exterior street or bulkhead along the low water line from about Corlear’s Hook; or, at furthest, a street of seventy feet wide at the extremity of such line as it ran, and outside of it. But consistently with their powers, and with their, frequent practice in colonial days and afterwards, below Corlear’s Hook, they could have done this.
3. But the statute and the commissioners’ grant under it, did vest in the corporation the fee of a strip of land, four hundred feet below low water-mark, for two miles from the point of termination under the Montgomery Charter, along the shore of the East River. Ko one contests the proposition, that the mere naked fee in this parcel of land under water passed to the corporation by the 15th section. Whether it should be in legal language defined as a qualified fee, or in trust, is a point of little moment to determine.
4. The operation of this 15th section of the statute was to establish, as the exterior line of the city, this line of four hundred feet from low water.
The corporation could have laid out an exterior street along the said line; could not have gone beyond it in any part to attain regularity; and of course could have laid out streets as they thought best in any direction within it.
As the Act of 1807, in the provisions for laying out the avenues, did not comprise or extend to this space under water, it follows that the corporation either had no power to lay out streets over it, (a proposition not to be admitted in the premises,) or had the authority under the general powers as to laying out streets vested in them.
Besides, the object of the grant being to enable them to run out wharves and piers, reasonably implies a power to make streets. Indeed, it may be noticed that South street was as often termed a wharf as a street, in old grants.
Again, it appears that the corporation claimed such a power. In the memorial presented by them to the Legislature in February, 1826, they state, that they had found it impossible to conform the regulation of that part of the city to the line of the grant from the Legislature; and that they had been obliged to make an exterior street, called Tompkins street, and other streets in conformity thereto.
*31 The line of the grant certainly means the outward line of four hundred feet.
I may here re-state the proposition that the corporation had power to lay out streets all through this piece of ground under water, with a view to its future regulation, without the least regard to the system of the commissioners of 1807. I am speaking, of course, of what they could lawfully have done, not as to what expediency might dictate should be done.
5. The phrase in the 15th section, defining the land to be granted as being contiguous to, and adjoining the lands of the Mayor, Aldermen and Commonalty within the said City of New York, is to be understood as meaning the tide-way. I cannot accede to the proposition of counsel, that if any portion of such tide-way for a given distance had been granted by the corporation prior to the act, the grant by the State would have been so far inoperative, and the land would have remained in the State. On the contrary, I think the phrase was only intended to define the line of boundary, without any regard to the fact whether the ownership existed still in the city, or had been granted away.
6. With respect to the qualification of an absolute fee with all its attributes, which arises from the proviso in the 15th section, it is, perhaps, true, that the corporation was not under a legal obligation to sell to any one, at any time, but might use and improve the property for their own account, filling it up, and running wharves and piers, as they did to the south of Corlear’s Hook.
[The learned Judge proceeded to examine the question, who were “ proprietors of the land adjacent,” within this 15th section. He held, they were, 1. The owner of upland, when no grant of tide-way had been made. 2. If the tide way had been granted to such owner, and he had conveyed it, then his grantee. 3. And the upland owners, when the corporation had granted the tide-way to another, after the act. It will be seen, in the opinion at General Term, that two of the Judges were not satisfied with the accuracy of some of these propositions, and considered that the case did not require their decision.]
We are next to examine the conveyances and grants of the parties, and of the corporation, between the Act of 1807 and that of 1826.
*32 [The several grants of the corporation, and of Nicholas W. and Peter G. Stuyvesant, stated in the foregoing report of the case, were then detailed, and the Judge proceeded.)
These conveyances, grants and proceedings present this striking case: That Nicholas W. Stuyvesant obtains, in 1810, a grant under water, which, upon any possible construction, was adjacent to his upland, and running to the whole extent of the right of the corporation, and somewhat beyond it. This is obtained without remonstrance from Peter G. Stuyvesant—nay, with his tacit acquiescence down to 1825. And this adopts and pursues the line of Stuyvesant street, continued, as a boundary. We have next Peter G. Stuyvesant selling all his title as upland owner to Flack and Gouverneur in 1825, and these owners, in the same year, taking a grant of land under water, down to the extreme limit of the right, and down to what they anticipated would be sanctioned. This grant is taken, adoptiiig the same line of Stuyvesant street, continued, as its boundary; and this is submitted to, without objection, by Nicholas W. Stuyvesant, until at least 1832, when he conveyed. We have again N. W. Stuyvesant making a grant, in 1832, of all the water-lots, or land under water, including the land granted in 1810, with all his rights to any future grants by the corporation in front of the premises; and this conveyance pursues the line of Stuyvesant street.
Now, the case of O'Donnell v. Kelsey may be considered, at least, as settling this proposition, that the acts and acquiescence of parties maybe treated as fixing a conventional line for the division of water rights, where it is just in itself, and does not violate either a provision of a statute or a rule of law. (4 Sandf. Sup. Ct. Rep. 206; Selden’s Notes of Cases, Court of Appeals.)
But I do not wish to rest my decision upon this point, although it is not without great weight. I place it upon two grounds, viz., that the corporation had the right to make the grants as it did make them; and that every principle of a just and equitable apportionment between the parties, prescribed and sanctioned that division which the grants pursue.
. It is impossible to say that the corporation was under an imperative obligation, after 1807 or 1826, to make its grants of land under water according to the lines of the streets. This proposition cannot be sustained. To accommodate those grants to such lines *33 was a matter of wise and expedient municipal regulation. It cannot be regarded as of any higher nature.
If they had the power to grant in a different manner than by the streets, then it was equitable to grant according to the just rights of the parties, as tested by an equitable division among them. And then, if in these grants there has been a union of the exercise of unquestioned power with the observance of a true equity, it would seem impossible to overthrow them.
Now, that Flack arid Gouverneur were owners of adjacent shore land, at the time of their grant, down to Stuyvesant street, is indisputable. That N. W. Stuyvesant was the owner, in 1810, of the remaining adjacent shore land, and that his actual right in part, and his right of acquisition for the rest, for the whole strip up to Stuyvesant street went to Bliss, is equally clear. And the grantees of Bliss eventually obtained what Stuyvesant gave them the right to acquire. I cannot find room for a single doubt as to the question of power.
It remains, then, I think, to ascertain whether such a division, as was thus apparently and in the instruments effected, was an equitable apportionment, and such as a Court should uphold. I think, however, that this point may be best considered, after making the few observations I propose to make under the next head.
Y. The Statute of February 25th, 1826, gave, in its first section, an extension along the East River from the termination of the two miles given in 1807, and of four hundred feet from low water; and the second section formed a new exterior line. That section was altered and repealed by an act, of April 13, 1826, which provided as follows: That Tompkins street, along the East River, as laid out and approved by the Mayor, Aldermen and Commonalty of the City of New York, shall be the permanent exterior street on the East River between Rivington street and 23d street; and that all grants made and to be made, by the said Mayor, Aldermen and Commonalty, shall be construed as rightfully made to extend thereto; “ and that all the provisions of the act entitled An Act to reduce several laws relating particularly to the City of New York,’ passed April 9, 1813, and the several acts amendatory thereof and in addition thereto, shall be construed to apply to said Tompkins street.” (Sess. Laws 1826, p. 155.)
*34 In order better, to understand this act, we must advert to some previous proceedings of the Common Council.
The memorial of that body, upon which it was passed, set forth, that owing to the flat and low land, the uncertainty of the time of high water, the undulations of the shore and other circumstances, between Grand and 23d streets, they had found it impossible to conform the regulation of that part of the city to the line of the grant from the Legislature, and that they had been obliged to make an exterior street, called Tompkins street, and other streets in conformity thereto; and they asked a confirmation of their proceedings.
The grants before stated, made in 1824 and 1825, were perfectly operative and valid, as against the corporation, down to the extremity of the four hundred feet. They were inoperative as against the State, for all the space beyond it, down to Tompkins street. But I presume, upon a familiar rule of law, they would have precluded the corporation from claiming title to that excess, had the title been subsequently expressly vested in them by the Legislature.
Ho such title was vested; but the statute operated to transfer to the previous grantees the space, down to Tompkins street, directly from the State.
The corporation, in the cases of these prior grants, having assumed to convey down to Tompkins street, the State ratified their act, as if they had lawfully possessed the power. In any view, the statute took effect—either from its passage, as a grant, or from the' date of the conveyance, by the corporation, as a confirmation.
But the statute also referred to grants to be made in future. It operated in a similar way. The grant, down to the limit of the four hundred feet, took effect as a conveyance of the soil by the owner. Beyond that, it took effect as a virtual grant or confirmaby the State to the grantee.
I am thus brought to the question, whether a division between the owners which should adopt the line of Stuyvesant street, as the dividing line between them down to Tompkins street, would be a just and equitable one.
It may be here observed, that in the complaint of Dr. Nott—in the answer of Thayer and Flagg, and in that of the corporation— the proposition is stated and admitted, “That the plaintiff, and *35 those claiming under Nicholas W. Stuyvesant and Peter G. Stuyvesant, now stand in the same legal relation to each other as they, the said Peter G. and Nicholas W. stood, when owners of the said premises.”
I do not mean to say that any of the parties are bound by this statement, as they would be by an admission of a matter of fact; but I consider the proposition as one of indisputable truth, and fall of important consequences.
Then the simple mode of viewing the subject is this: Suppose Peter G. and N. W. Stuyvesant had applied together for grants, after the statute—viz., in March, 1826—and that the corporation had granted to them the whole parcel down to Tompkins street, as tenants in common—how should a division have been made between them ?
Their devisor had brought the line of their possessions down to the shore by the boundary of Stuyvesant street; and it would be a natural suggestion to continue such line, if it was an equitable one, in the same direction.
This street was one of the streets laid down by Stuyvesant, in the same manner as numerous streets were laid down by individual proprietors in New York. So late as March, 1831, it was recognized as a public street by that name, or such other name as the Common Council might determine, from the Bowery to the Second Avenue. (Sess. Laws, 1831.)
[The Judge proceeded to consider the rules for the division of lands under water, and cited and examined the following authorities :—Deerfield v. Arms, (17 Pickering, 41;) Duranton, (Droit Francaise, tome 4, p. 424;) Tovillier, (Droit Civil Francaise, tome 3, §§ 155, 156;) Emerson v. Taylor, (9 Greenleaf, 142;) O'Donnell v. Kelsey, (4 Sandf. S. C. Rep. 206.) The resolution of the corporation of April 1,1834, (Doc. Board of Assistants, p. 367.) Reed v. The Boston Mill Co., (6 Pickering, 158;) Knight v. Wilder, (2 Cushing, 209 ;) Walker v. The B. & M. R. R Co., (3 Cushing, 223;) Gray v. Deluce, (5 Cush. 9;) Dawes v. Prentice, (16 Pick. 435 ;) Sparhawk v. Bullard, (1 Metcalf, 95 ;) Piper v. Richardson, (9 Metcalf, 155.)]
After a careful examination of all that I am aware has been decided, and the views of practical men and surveyors, I think the following rules best calculated to effect a fair and legal di *36 vision among coterminous owners lying in a cove, who are to run across flats or land under water to an exterior line.
1. That a base line be run across the mouth of the cove, from point to point, and its length ascertained.
2. That the shore line be measured, as well as the length of each owner’s shore line.
In doing this, the rule of the best authorities is, that if the line of the shore is varied by deep indentations or sharp projections, the measurement is to be adjusted upon the general available line of the land. Sometimes there will be a cove within the cove, at right angles to its general line at the point.
In general, where there is an indentation, the line from point to point, pursuing what would be the course if no such indentation existed, should be measured. And so, where there is a projection, the line is to be measured across the base of the projection. Slight deviations from the general line are to be disregarded. These general rules, varied by peculiar circumstances, and applied by experienced persons, will be found to meet equitably most cases that arise, and to assist in the solution of the most difficult.
3. The base line across the cove (or chord of the arc) should be considered as the line upon which the rights and proportions of the parties are to be adjusted up to the established exterior line.
It is obvious, that if the cove should be a regular half circle, it may be broken into any number of ownerships, and yet lines may be drawn to the chord of the arc without interfering with or crossing each other, or touching upland. The ratio of a diameter to a circle being about 7 to 22, that of the chord of a half circle is as 7 to 11. Each owner, for 11 parts on the shore, would have 7 on the base line.
And again, many coves are capable of being reduced, without injustice to any one, to a nearly regular half circle. One of Mr. Ewen’s maps, in the present case, shows this with clearness.
4. The shares in the base line being thus established, divisional lines, run from the points of the owners on the shore, give each his own proportion of the land within the cove; and the shares on the base line fix also the ratio and basis upon which the shares of the exterior line are to be computed.
There is scarcely a rule ever suggested by which the apportion *37 ment by the line of Stuyvesant street will not appear equitable. By the mode best sanctioned by authority, it is singularly so. I have caused a map to be made and annexed hereto, showing my results, and illustrating the following statements: Take each owner’s line of the shore, and divide, upon the base line of the cove upon Map No. 1, from the very marked points upon it, viz., Burnt Mill Point and the projection on the corporation land. The shore line of N. W. Stuyvesant is 1975 feet, of Peter G. Stuyvesant, 2680 feet, (it may be noticed that the grant to Flack and Gouverneur make this line 2600 feet,) and the corporation line, measured on the arc of the large inlet on the north, is 763 feet; the whole shore line being 5418 feet. The base line up to Stuyvesant street is 1485 feet;—to 23d street continued, 1846 ; and from there to the extremity, 755 feet; making together 4086 feet. On these data, N. W. Stuyvesant should have 1489 feet on the base line, and gets 1485 ; P. G. Stuyvesant should have 2021, and gets 1846; and the corporation, 576, and gets 755.
Divide the excess of the line taken by the corporation between Nicholas W. and Peter G., and Peter G. would have on the base line 89 feet more than he actually takes.
Next establish the right on Tompkins street, upon the hypothesis of the right on the base line across the cove, controlling it: N. W. Stuyvesant should have 1553 feet, and has 1575; and Peter G. should have 1932, and has 1910.
‘ Again, test the division by a comparison between the shore line and the line of Tompkins street, and the result is, that N. W. Stuyvesant should have received an extent of 1479 feet, and gets 1575, a difference of 96 feet; and Peter G. Stuyvesant loses so much.
It will be seen by the same map, that the area of P. G. Stuyvesant’s land down to the base line (or chord of the arc) is 871 lots of ground and a fraction, and that of N. W. Stuyvesant 411 lots and a fraction. But, by continuing the line to Tompkins street, N. W. Stuyvesant gets 269 lots, and Peter G. 118; so that the difference, then, is 309 lots in favor of N. W. Stuyvesant, to make an equal division between them. But it is proper to consider their rights, in this particular, as connected with the whole right of the shore line down to Ninth street. It will be seen that a line of 950 feet, nearly parallel with the shore line, is drawn on *38 the map, which brings the line opposite to the north side of Ninth street. The area of this strip is 208 lots; thus leaving about 100 lots of difference. The triangular piece, gained by N. W. Stuyvesant in consequence of the running by the lines of the streets, will diminish this to about 60 lots.
This result, upon a division of about 2000 lots of land, is not a little surprising.
The division, being thus equitable, is followed up by the grants actually conforming to it. These have been before stated at length.
On what ground should they be interfered with ?
Had not the corporation the right and power to grant the soil under water, in the manner they did ? To suppose otherwise, is to assume that they were under a legal obligation to grant only according to the line of the streets, and that a grant in any other mode would be illegal.
The Court is asked to set aside or modify grants actually made, and in pursuance of an equitable adjustment of rights, because not made in obedience to an assumed law binding upon the corporation. I do not find that such a law exists; nor any necessity, in the case, for such a division as is claimed.
It amounts to this: Because 15th street, laid out for the public. regulation of the city, strikes the point of division of the farm at high water," viz., at Stayvesant street; therefore, the line of division of all right to land under water, beyond it, must be settled by the line of that street continued. All equitable allotments of the land are superseded; all previous grants of rights or privileges are annulled; and a municipal regulation is to have the effect of sweeping away some acres of ground from one, and of transferring them to another, when imperative law does not command it, and equity and fairness forbid it.
Next, Flack and Governeur, having thus acquired all the right of Peter G. Stuyvesant, and having got the full right to the extent which the corporation could then convey, could have disposed of the property under water exactly as they could have conveyed the property on the upland. If they sold a strip within the exterior line, touching the upland, the grantee took it just as granted, and all right attached to a shore ownership, if not expressly reserved, was superseded. If they sold down to the ex *39 terior line, that grantee took just what was given to him, and he took the benefit of a future accession from the State or city.
The grantee of a strip on the shore acquired nothing but what was comprised within the limits of his deed, if he did not bound on Tompkins street. Each intermediate grantee acquired what was within his deed, and no more. The grantee who bounded on Tompkins street, and he alone, may perhaps take a pre-emptive privilege to any future extension, if the State should grant such extension with a pre-emption attached to it.
YE. The last subject of consideration, was the effect of the Act of the Legislature of the 11th day of May, 1835, upon the questions in the case, and the rights of the parties.
It will be noticed, that the complaint in the suit of Nott v. Thayer and others sets forth that Thayer and Flagg had applied for a grant of land under water which reaches to Avenue D, (and which comprises land running further into the river than the exterior line of Tompkins street;) that the proper committee was about to report in favor of such grant; and the corporation state in their answer that they are advised these defendants are entitled to such grant. These defendants insist upon their right to these four parcels, which are marked “ Thayer and Flagg” on Map No. 3. Whatever title Smith’s estate had to these parcels, is conveyed to them by their deeds of the 9th of April, 1850.
On the other side, the plaintiff, Nott, asks in his complaint that he be declared entitled to the grants of these parcels whenever made by the corporation; and that Thayer & Flagg be prohibited from receiving them.
So it appears that a grant for a considerable parcel, beyond Tompkins street, has been prepared and approved by counsel, to be given to Campbell & Moody, extending from 19th to 20th street, and from the easterly side of Tompkins street to the easterly side of Avenue D; but the Comptroller has refused to deliver it; and further, that the Gas Light Company have received a grant of a parcel opposite their premises, between 21st and 22d streets, also extending to the eastward of Tompkins street.
The counsel of the corporation, upon the trial, has submitted these questions to the Court; asking, however, as I understand him, that the operation of the Act of 1835 should be adjudicated; *40 and he has suggested a doubt whether that act does really confer any right of soil, or power to convey any such right, upon the Corporation.
It is clear, upon the principles I have previously stated, that, as between the plaintiff, Nott, and the other parties, no one of the latter could have any right to either of the parcels lying south of the centre line of Stuyvesant street continued, and easterly of Tompkins street, except the most northerly triangular strip. The line of Tompkins street'being the new base upon which rights to further grants should be adjudged, and the lines then regulated by the streets, it is obvious that the plaintiff, Nott, would be entitled to the parcels, with the exception noticed. And again, as Francis Griffin’s estate is the owner, on Tompkins street, of the strip between 18th and 19th streets, acquired as early as 1846 and 1848, that estate would be entitled to the triangular northerly piece before mentioned.
But, after much consideration, I am unable to see how the Corporation has any power to make a valid grant of land under water beyond the limit of Tompkins street. I cannot, therefore, adjudge, either that the Corporation be at liberty to consummate the grant to Thayer and Flagg, or judicially to pronounce in favor of the demand of the plaintiff, Nott, in relation to any of the ground under water easterly or outside of Tompkins street. My views and reasons are these:—
On the 12th day of November, 1832, Benjamin Wright, the street commissioner, made a report to the Common Council of a plan for the permanent regulation of that part of the city lying between 14th and 23d streets, the Third Avenue and the East River. (Document 32, Board of Assist., vol. 2, p. 228.) This report was read in evidence, and it states the line of a bulkhead as the line to be fixed southwardly down to 15th street, thence eastwardly along 15th street to Tompkins street, and thence along Tompkins street, as before established. This line is described as running along the edge of the flats, and may be seen on Diagram No. 3. It was, with a trifling exception, inside of Tompkins street.
On the 8th of February, 1833, a resolution, which had passed both boards, was approved by the Mayor, resolving that the plan recommended by the street commissioner, under date of Novem *41 ber 12, 1832, as delineated on a map accompanying such, report, be adopted, whenever the parties holding water grants between 15th and 25th streets shall enter into legal covenants in relation to their surrendering their present grants, which are bounded by Tompkins street, and taking out new ones bounded by the new line proposed as the exterior line of the city, and depositing the same with the street commissioner. In February, 1835, a memorial of the Corporation was presented to the Legislature, the contents of which are sufficiently set forth in a report of a select committee of the Assembly of the 22d of April. It stated, that by the present plan, the exterior line of an eastern section of the city requires the displacing of a great extent and depth of water; and immense quantities of earth would be necessary to fill up the space between the shore and a bulkhead corresponding with said line, the expense of which would be inexpedient; and prayed that a law might be passed, granting authority to arrange, regulate and alter in such manner as they may hereafter decide upon, the map of the city between 13th and 23d street, the First Aventie and the East River. The committee recommended that the prayer be granted, and introduced a bill for that purpose.
This led to the Act of May 11, 1835, the provisions of which are merely these: “ That it should be lawful for the Mayor, etc., to adopt such plan as they might deem expedient for regulating and laying out that part of the city which lies between 13th and 23d streets, the First Avenue and the East River; and to designate and direct where the permanent exterior line or street, eastward of such part of the said city, shall be, in place of that part of Tompkins street which now lies or is laid out to the eastward thereof on the present map or plan of the city.
“ Such plan as may be adopted for the regulation and laying out of the above-mentioned part of the city, or for the permanent exterior line or street thereof, shall become and be deemed in law as part of the map or plan of the said city.” (Sess. Laws, 1835, p. 309.)
Soon after the passage of the act, and by a resolution approved the 30th September, 1835, the Common Council resolved that the plan reported on the 12th of November, 1832, by Benjamin Wright, be adopted, and the exterior line or street there laid down be approved of according to such plan: provided, that the grant *42 of the 1st of August, 1825, to Flack and Gouverneur be surrendered and cancelled, according to the terms of a certain instrument between A. M. Bruen and Matthias Bruen and the Common Council, dated the 11th of April, 1835, deposited with the street commissioner. This surrender does not appear to have been made.
In relation to this Act of 1835, it appears to me that the Legislature did not intend to grant, and it cannot be construed into a grant or authority to go beyond Tompkins street.
1. The memorial, the report, the adoption of Wright’s plan in February, 1833, and the resolution of September, 1835, demonstrate that the Corporation sought only, and the Legislature sanctioned only, an alteration in the map of the city, and of the exterior line as fixed by the Statute of 1826, and that such alteration was to be made within the line so fixed.
2. It was necessary to apply to the Legislature for an alteration' of the map of the city, which when once made was unchangeable, except by legislative power. This was provided in the Statute of 1807, and continued to be the law whenever new streets were laid out, or old ones varied.
3. There is not a word in the act giving a right to any soil under water beyond Tompkins street, upon any construction which the words will bear. There is not a phrase which authorizes the city to grant such other soil—nor is there a word which could operate to transfer the title of the State, either to the Corporation or to any grantee. When we examine the acts of the Legislature which profess or operate to transfer a title, we find that they may be thus classed:—
Where they expressly grant a right of soil, as in the Statute of 1807, and others; where they confer the right of the State, through the Corporation, or upon some act done by it, to individuals—such was the Statute of 1798, giving the intermediate spaces up to South and West streets to the owners, upon fulfilling the directions of the Corporation as to filling them up, and otherwise ; and where they act, as the Statute of 1826 does, by vesting the grantee of the city, whose grant extends up to the limit of the 400 feet, with the land beyond it up to a new line—such was the Act of 1826 as to Tompkins street. (See also the Law of April 12, 1837, as to the Thirteenth Avenue, and that of May 13,1846, as to the Eleventh Avenue.)
John M. Barbour and Wm. Curtis Noyes, for Eliphalet Nott.
I. Under and by virtue of the grant made by the Corporation of New York to Nicholas William Stuyvesant, in 1810, the Act of April 13, 1826, the several conveyances derived from Stuyvesant, set forth in the pleadings and evidence, and the release of quit-rent executed by the Mayor, etc., of New York, Eliphalet Nott is the owner in fee simple of all the lands 223 feet in width, bounded by the centre of Stuyvesant street on the north, and ex *44 tending from high water-mark to Tompkins street. (Act of 1807, 5 Laws N. Y., 130; Act of 1826, 7 Laws N. Y, 155 b.)
*43 But in every case there is something to indicate the intention to transfer the title of the people, and words legally sufficient to effect such transfer. In order to conclude that the Corporation have the power under this Statute of 1835, we must conclude, as matter of law, that the power to change the map in a certain particular, passed expressly without the slightest view of granting new land, is to operate as a conveyance of the large space now claimed, without a word similar to what the State has always employed to transfer its title.
• I am brought to the conclusion, that the establishment of the exterior lines as proposed in the ordinance of July 3d and of November 27th, 1850, was wholly unauthorized, and that the grants of the Corporation, for any strip beyond Tompkins street, would be invalid.
The result, therefore, is, that I adjudge the rights of the parties upon the basis of Tompkins street being actually the exterior street of the city, at all the points involved in this controversy.
A judgment was entered in conformity with that opinion. It is unnecessary to give the details of the judgment. The points decided sufficiently appear in the opinion, and the modification thereof in the statement of the decision of the General Term.
From the judgment at Special Term, appeals were taken as above stated.
Before the appeals were argued, the defendants Thayer and Flagg entered into some arrangement by which they ceased to press their claim, and they therefore were not represented on the argument of the appeals.
*44 First.—The grant made by the Mayor, etc., of New York to Stuyvesant was valid, and vested in him a perfect title to the lands covered thereby.
a. At the time the. grant was made, the Corporation of New York was the owner in fee simple absolute of all the land in front of both the Bowery and Petersfield farms, between high and low water-marks. (Kent’s City Charter and notes, pp. 16, 143, 161, 175, 197; Mayor v. Scott, 1 Caine’s R. 544; Furman v. Mayor, 5 Sandf. 16.)
b. The Corporation, being the owners of the tide-way in front of both farms, had power to grant the 400 feet strip lying outside of low water-line to any person whatever; notwithstanding the proviso contained in the Act of 1807. (Furman v. Mayor, 5 Sandf. 16; Gould v. Hudson River R. R. Co., 2 Seld. 522; Mayor v. Scott, 1 Caine’s R. 544; Davies’ Laws N. Y., p. 1227, n.)
c. If, however, the term “ adjacent owners,” as used in the Act of 1807, was intended to include the owners of the uplands above high water-mark, and to give them the pre-emption of the 400 feet strip, then the grant to Nicholas William Stuyvesant, in 1810, was rightfully made, and vested in him a perfect title to the premises covered thereby.
1. A boundary upon the line of Stuyvesant street, constituted an equitable division of grants to Peter G. and Nicholas William Stuyvesant. (Rush v. Boston Mill Corporation, 6 Pick. R. 158; Sparhawk v. Bullard, 1 Metcf. R. 95; Emerson v. Taylor, 9 Greenleaf R. 42; Deerfield v. Arms, 17 Pick. 41; Gray v. De Luce, 5 Cushing’s R. 10.) 2. Stuyvesant street constituted a natural and proper line of division. (Stuyvesant v. Underwood, 19 John. 181.)
Second.—By the Act of 1826, the grant made to Stuyvesant by the Corporation, in 1810, was extended to Tompkins street. (7 Laws N. Y., pp. 43, 155; Davies’ Laws, 777.)
Third.—At the time of the commencement of these actions, Dr. Nott was the owner, under conveyances derived from N. W. Stuyvesant, of the lands so vested in N. W. Stuyvesant, by the grant of 1810 and the Act of 1826.
II. The grant made by the Corporation to Hezekiah Bradford, in 1844, was valid; and Dr. Nott is now the owner of the prem *45 ises covered thereby, under conveyances derived from Bradford.
III. The grant made by the Corporation to Dr. Nott, in 1848; and the Act of 1826 vested in him the title to the premises bounded by high water-mark, 14th street, Tompkins street and 13th street.
IV. Whether Dr. Nott is, or is not, the owner of the premises extending from the shore to Tompkins street, and bounded on the north by Stuyvesant street, none of the parties to these actions are entitled to claim as against him, under or by virtue of the grant made by the Corporation to Flack and Gouverneur, for that grant is, under the facts in evidence, void by its terms.
V. The street designated upon Diagram No. 3, as “ The exterior line of the East River, adopted by the Common Council, July 3, 1850,” is the exterior street of the city, opposite the premises which are the subject of the controversy in this action. (Laws of 1835, p. 309; Davies’ Laws, 782.)
VI. The exterior street, so authorized by the Legislature, in 1835, and laid out by the Common Council, is subject to all the provisions of the Acts of 1798 and 1813. (2 Laws N. Y., p. 244, §§ 220 et seq.; Act of 1798, Davies’ Laws N. Y., p. 396.)
VII. The owners of lands upon Tompkins street, under grants from the Corporation and the Act of 1826, are, therefore, entitled respectively, and may be compelled, to fill up and become the owners of the space between Tompkins street and the exterior streets designated by the Common Council, in 1850, bounded by lines running in such a direction as will give to the several owners of lands upon Tompkins street their respective proportions, according to the breadth upon Tompkins street of their several lots; and are also entitled to build piers in front of their premises on such exterior street, whenever required to do so by the Common Council, and to receive the wharfage thereof.
VIII. The line between the lands which Dr. Nott and the plain- . tiffs in the second suit are respectively entitled to fill up, will run from the westerly side of Tompkins street, about at right angles with that street, and more northwardly than the line of Stuyvesant street. '
J. Larocque and Greene G. Bronson, for A. Belmont and others, plaintiffs in the second suit.
*46 I. Flack and Gouverneur, from whom Belmont and others derive their title, were the proprietors in fee of the uplands adjacent to the waters of the East River, between 17th and 19th streets, at the time they obtained their water grant, in 1825; and Belmont and others are the proprietors in fee of the lands granted to Flack and Gouverneur, between 17th and 18th streets, Avenue A and Tompkins street, and between 18th and 19th streets, the 1st Avenue and 'Tompkins street. The water grant to Flack and Gouverneur, in 1825, included the shore or tide-way, as well as the four hundred feet and other lands, to Tompkins street.
II. As such proprietors, Belmont and others have the pre-emptive right to all the lands under water between 17th and 19th streets, and the permanent exterior line of the city, so far as those lands have not already been granted to the persons under whom they hold. This involves the question, how the water grants should be laid out; and we say they should be so laid out as to extend into the river in the direction of the streets.
III. The statutes on this subject cover both the east and the west sides of the island, and can only be properly executed by proceeding upon a general and uniform plan in laying out all the water grants on both sides of the town. (Kent’s Charter, p. 85, § 37; id. p. 87, § 38; 5 Webster’s Laws, 125, Act of April 3, 1807, § 15; Laws of 1826, p. 43, Act of Feb. 25,1826; id. p. 155, Act of April 13, 1826; Laws of 1835, p. 309, Act of May 11, 1835; Laws of 1837, p. 166, Act of April 12,1837; 2 Rev. L. 1801, p. 126; 2 id. 1813, p. 432; 1 Greenl. p. 284, Act 9, 1786, § 18; 1 Rev. St. p. 208, §§ 67, 8, 9.)
IV. The provisions in relation to water grants are connected with the provision for laying out streets and avenues, both objects being specified in the Act of 1807; and it was evidently the intention of the Legislature that the upper part of the island should be laid out upon a uniform plan, including the lands then under water, which, when reclaimed, would constitute a part of the city.
_ _ V. The rights of the riparian owners are governed by the principles of law, and not by any supposed discretion in the Corporation to lay out water grants at pleasure. The words of the Act of 1807 are, “ the proprietor or proprietors of the lands adjacent shall have the pre-emptive right in all grants made by the Cor *47 poration of the said city of any lands .under water granted to the said Corporation by this act.”
VI. For the purpose of giving effect to the statute and securing the rights of all parties, it is plainly necessary that the Corporation, in laying out water grants, should proceed upon a general and uniform plan—one which includes all the waters and all the proprietors, and gives every one his just share with reference to such plan.
VII. If the question is considered independently of what has actually been done by the commissioners and the Corporation, under the Act of 1807, it will be impossible to uphold this judgment. It is evident that the Legislature intended that the upper part of the island should be laid out upon a general arid uniform plan. By coupling the provision for water grants with that for laying out streets, it must have been the intention of the Legislature that the plan of the city should include the lands to be reclaimed from the rivers, as well as the uplands. Without such a plan, one of two things must inevitably follow—either all of the waters will not be granted, or some proprietors will get more than their just share of the property. The lands to be reclaimed were to constitute part of a great commercial city, and for that reason were to be laid out upon a general and uniform plan.
The facts that the Stuyvesants owned a large quantity of up-land, and that a part of it was situate on a cove, does not exempt them from the rules of apportionment which govern in the case of other and less extensive proprietors. The laws in question are alike applicable to all, and entitle every one to water grants in proportion to his possessions on the shore, whether great'or small. And the cove was to be blotted out by making a new water front on the river. The only practicable mode of executing the statute, is that of starting from the two points where the lines of each proprietor touch the shore, and from thence running parallel lines into the rivers. The direction in which the lines of any riparian owner reach the shore does not govern the direction of the side lines of the water grant. The proper breadth of any water grant is not controlled by the figure or"quantity of the adjacent upland, but by the front on the river, and a general plan of laying out all the grants. The proper direction of running the side lines of any grant into the river does not depend upon the direction of the *48 shore at any particular place, nor upon its sinuosities, whether small or great. Neither the right to, nor the proper extent or form of a water grant depend upon the question, when or from whom the riparian owner obtained his title. All are governed by the fact of ownership at the time the grant is made, the extent of the proprietor’s line on the shore, and a general plan which divides all the water to be granted among all the riparian owners. Aside from what has actually been done under the Act of 1807, the form of the island, and the object which the Legislature had in view, (the building of a great commercial city,) left no room for doubt about the proper mode of laying out streets and water grants. The general course of the island, from north to south, corresponds with the general course of the North and East Rivers, and that is the proper base line from which to run perpendicular lines in laying out the city, including water grants on both sides of the island. This is the only plan which is adapted to the form of the island. It is the only plan which will secure uniformity in laying out the town, including the portion to be reclaimed from the two rivers. This plan secures more perfectly than any other the public convenience and the rights of all the riparian owners. This plan, which agrees precisely with what has actually been done in laying out the town, gives us the lands which we claim. If the water grant to Bradford, under which Nott and Lowber claim, had been made before the commissioners’ map was filed, it could not be upheld to an extent which would affect Belmont and others whom we represent.
VIII. But the grant to Bradford was not made until 1848, nearly forty years after the commissioners’ map had been filed, and after Francis Griffin, under whom we hold, had acquired title between 17th and 19th streets; and whatever doubt there may have been before the commissioners had completed their work, that doubt must be removed by what has actually been done by the commissioners and the Corporation, in laying out the town, including water grants. The commissioners have carried out the intention of the Legislature, by laying out regular streets and thoroughfares, on the plan best adapted to the form of the island and the object in view. The map of the commissioners is by law final and conclusive upon the Corporation, land owners, and “ all other persons whomsoever.’’ (5 Webster, 125, § 8.) The Corpor *49 ation has also borne its part in carrying into effect the intention of the Legislature, by continuing the streets and avenues into the rivers, in their direction on the upland, as laid out by the commissioners, and making water grants in conformity with the general plan, running parallel lines into the rivers in the direction of the streets. The proper mode of laying out water grants had thus been settled by a practical construction of the statutes for nearly forty years before the grant to Bradford was made, and it was then quite too late to depart from that construction.
IX. If the Corporation was not bound by law to make water grants in conformity with the commissioners’ plan of the town, still, the provision that the adjacent proprietors should have the pre-emptive right to all the waters granted to the Corporation, necessarily implied a just division between them, and this could only be effected by laying out the grants upon some general plan; and after the Corporation had settled and acted upon that plan for more than thirty years, it was quite too late to depart from it in making the grant to Bradford.
X. If the statutes in question are regarded as containing nothing more than an authority to make water grants to adjacent proprietors, the Corporation, before making the grant to Bradford, had, by a long and uniform practice, settled the plan of making a just and proper division among the proprietors, and was not afterwards at liberty to depart from that plan.
XI. Whether the learned Judge was right or wrong, in relation to the proper apportionment between riparian owners of flats between high and low water-mark, under the Massachusetts ordinance of 1641, or in relation to the proper division of islands formed by alluvial deposits in a river, he clearly erred in applying those rules to the apportionment of water grants under the New York charter and laws, which are to be made for the purposes of commerce and as part of a great city.
XII. The principles which govern the rights of riparian owners, in relation to the four hundred feet granted to the Corporation by virtue of the Act of 1807, are applicable to the lands under water lying between the four hundred feet and Tompkins street. (Laws of 1826, p. 43, § 1, and p. 155, § 1; 2 B. L. 432, §§ 220, 221, 222.)
XIII. The grant made to Bradford in 1848, under' whom the *50 defendants, Nott and Lowber, claim, so far as it includes lands lying north of 17th street, is void. (1.) Because it was made without authority, and in derogation of the legal rights of others. (2.) It was also void by force of the express condition in the grant.
XIV. It is wholly unnecessary to inquire whether the Corporation, either prior or subsequent to the Act of 1807, was under any obligation to make grants to riparian owners of lands between high and low water-mark, which were vested in the Corporation by its charter. It is enough, that they have actually granted the tide-way, and far beyond it, to the persons under whom Belmont and others derive title.
XV. It is also unnecessary to inquire whether the Corporation can in any case be compelled to make water grants. It is enough for our present purpose to say, that when the Corporation does make water grants, it must be done upon established principles; and that the grant to Bradford, so far as it cut off a part of our front as adjacent proprietors, cannot be maintained.
All that we ask is, that the grant to Bradford, so far as it conflicts with our rights, should be declared void, and the defendants, Nott and Lowber, should be enjoined from placing any obstructions in the river, in front of our property.
The Corporation is ready and willing to grant to Belmont and others, in accordance with their claim, so soon as the injunction against making it is dissolved, and the principle of apportionment is settled.
XVI. The water grant to Nicholas W. Stuyvesant, in 1810, does not affect our claim.
XVII. The learned Judge, before whom the cause was tried at the Special Term, erred in deciding that the Corporation was not authorized, under the Act of May 11,1835, to lay out an exterior street to the eastward of Tompkins street, and that that act could not be construed into a grant or authority to that effect, and in adjudging the rights of the parties upon the basis of Tompkins street being actually the exterior street of the city.
XVIII. The Court, at Special Term, erred in deciding that the Corporation of New York has not now, and never had any power to make a valid grant of land, under water, beyond the limits of Tompkins street.
*51 XIX. If, therefore, the Corporation have the right to make grants beyond Tompkins street, the plaintiffs are entitled to all the land under water between 17th and 19th streets, beyond, Tompkins street, and out to the new exterior limits of the city. But if, as held by him, the Corporation have not now the right to make grants beyond Tompkins street, it is submitted that the learned Judge, who decided the cause at Special Term, committed a palpable error in deciding in advance who would be entitled to those grants, when the Corporation should receive from the State the power to make them.
XX. The learned Judge also erred, even upon the principle adopted by himself, in extending the line of Eliphalet Nott upon Tompkins street to the southerly side of 18th street, and limiting our southerly extension upon Tompkins street to the southerly side of 18th street.
On the contrary, the line of Stuyvesant street strikes the easterly line of Tompkins street at a point considerably below the southerly line of 18th street.
XXI. Even if the Corporation have no present right to grant beyond the limits of Tompkins street, the plaintiffs were entitled to the remedy prayed in their complaint, restraining the placing of obstructions, by the defendants, Nott and Lowber, in the waters of the East River, between 17th and 19th streets; and the Court, at Special Term, erred in not awarding that relief.
XXII. If the decision of the Court, at Special Term, that the line of Stuyvesant street continued to the easterly side of Tompkins street was to be our boundary, was correct, then the limiting them by the line of 19th street on the north was an error, and new boundaries should have been established, upon just and equitable principles, between us and the defendants owning north of 19th street, and between those defendants respectively.
XXIII. The case cannot be decided on the ground that we have lost our rights, by any supposed acquiescence in the line of Stuyvesant street continued as a proper boundary. Adams v. Rockwell (6 Wend. 285).
David D. Field, for defendants, Smith, Benjamin and Roberts.
I. The only grants of land -under water which the Corporation *52 of the City of New York has authority to make to the proprietors of the upland or shore, are grants of land extending into the river in the direction of the streets. The language used in the Acts of 1807 and 1886 is, “the proprietors of the lands adjacent shall have the pre-emption right in all grants made by the Corporation of the said city of any lands under water,” etc. In the Act of 1837, the language is, “adjacent to and in front of” the lands, etc. What are the lands under water “ adjacent to and in front of” the shore, is the question? We say they are the lands lying between the same streets; and for the following, among other reasons:—(1.) Such a construction is the more natural and obvious one. (2.) Such a construction most completely accomplishes the purposes of the Legislature. (3.) It has been the usage of the Corporation to make the grants conform to the streets. (4.) Since this usage began, the Legislature has made successive grants in nearly the game language, which is evidence that the Legislature sanctions this construction. (5.) This usage has become a rule of property, for subsequent purchases have been made in reference to it. (6.) Such a construction is the more equitable one. It is the one which secures a water front to the greatest number of proprietors, and the only one which does not give to some proprietors a double front and permit others to run diagonally across their neighbor’s front. (7.) Such a construction most corresponds with the general course of the two rivers. It best answers to the form of the island. It is the only one which conforms to the map of the city, as laid out by the commissioners, under the Act of 1807, and established by law. (8.) It is the only construction which gives a fixed and certain rule fbr defining the rights of parties. (9.) Any other construction leads to embarrassment and confusion. It makes irregular lots, intersects streets, and leaves unfilled spaces inside of projecting wharves and filled lots. (10.) A different construction may lead to the disturbance of existing titles, and opening disputes as to boundaries.
II. The defendants, Smith, Benjamin and Roberts, are entitled to all grants which the Corporation have had authority to make of lands under water “ adjacent to and in front of” the upland, or shore, between 20th and 21st streets. This involves two considerations —
First.—The title, independent of the two other grants.
*53 1. The defendants have succeeded to all the title which Peter G. Stuyvesant had, by virtue of his ownership of the upland on the 18th of April, 1825. 2. The owner of the upland is the “proprietor of the lands adjacent,” within the meaning of the 15th section of the Act of 1807. If the Corporation was indeed the proprietor of the lands adjacent, the proviso was senseless. Furman’s case was different, and decided on other grounds. There, the Corporation had received a grant of the 400 feet without any trust, and the decision went upon the peculiar phraseology of the preamble to the Act of 1798. (5 Sand. S. C. Rep. 38,40, 43.) In the present case, not only is there no evidence that the Corporation had conveyed any part of the strip between high and low water-mark, but the act assumes that they did not. 3. If, however, the Corporation be regarded as the proprietor of the lands adjacent, the defendants have succeeded to their title by virtue of the grant to Flack and Gouverneur, which conveyed not only the strip between high and low water, but at least 400 feet beyond.
Second.—The title, as affected by the two other grants.
1. These are grants to which neither the defendants nor their predecessors were parties. They are unaffected by them, therefore, except so far as they may have conveyed a title superior to that of the defendants. The plaintiff claims nothing, and has nothing by proscription or adverse possession. Though the grant to N. W. Stuyvesant was in 1810, there is no evidence or claim of adverse possession under it. To affect the defendants, therefore, by these grants, the plaintiffs must show that they granted what the defendants claim, and that they granted it rightfully. 2. Those grants conveyed no title to the grantees as against the defendants. (1.) If the city had only a power, it could only be executed in favor of the shore owners. If it had the fee, it was charged with a trust in favor of the shore owners. In the latter case, if the grant to N. W. Stuyvesant had been absolute, it might possibly pass the legal estate, subject, however, to a trust in equity. But, since 1 R. S. 730, § 65, a conveyance by a trustee in contravention of the trust is void; the grant to Bradford therefore conveyed no estate, legal or equitable. (2.) The grants, both of them, show on their face that they were executed in pursuance of the Act of 1807, and that they were intended to conform to the commissioner’s map of the city. The *54 grant to Bradford, moreover, contains a condition making it void, if he was not the real adjacent owner. (3.) If the grant to N. W. Stuyvesant did pass the legal estate, it did not convey the equitable title. The grantee holds, in trust, for the equitable owner-; and then the question is, who is equitably entitled ? that •is, to whom ought the Corporation to have granted ? This Court can rectify the mistakes of the Corporation as between the different claimants, and settle the boundaries between them.
Third.—But it is said, that even if the defendants have succeeded to all the rights of the original shore owners, and have received no detriment from the other grants, yet that the Corporation could give no title beyond the 400 feet, and that they have exhausted that. To this there are four answers:—(1.) If that were so, it would be fatal to the claim of Dr. Nott. He has obtained a grant beyond the 400 feet himself. (2.) The Corporation have not, in fact, granted the whole of the 400 feet. (3.) The Act of 1826, by its true construction, gives the Corporation authority in its future grants to convey more than the 400 feet, and to the exterior line. It is to derive a revenue from its grants proportionate to the lands granted. (4.) If, however, it were otherwise, and the Corporation could not grant, then the defendants take, by virtue of the Act of 1826, without a grant; and the Court should revoke the grant to N. W. Stuyvesant and Bradford, so far as they interfere with the defendants’ rights.
III. The acts of the Corporation, in establishing an exterior street beyond Tompkins street, were authorized by law, and are valid.
IV. The grant made by the Corporation to Nicholas Win. Stuyvesant, in 1810, does not deprive the defendants of any of the rights which they would otherwise have, upon the principles above stated, because: (1.) That grant was improperly made in the direction of Stuyvesant street. (2.) If the impropriety of the location could not now be questioned, yet the Act of 1826, conveying the grant to Tompkins street, does not convey it in the direction of the original grant, but in the direction in which an upland owner would have to go.
V. The grant made by the Corporation to Flack and Gouverneur, does not interfere with the defendants’ claim, because Flack and Gouverneur were entitled to all they received, and they do not receive expressly or by implication any right to more.
*55 VI. The grant made by the Corporation to Bradford does not interfere with defendants’ claim, because that grant was void, so far as it made Stuyvesant street a boundary.
VII. The acts of the Corporation, in establishing an exterior street beyond Tompkins street, are legal and valid.
John D. Sherwood, for defendants, Van Pelt, Campbell and Moody presented the same points.
R. Busteed and D. E. Sickles, for the Mayor, etc.
Slosson, J.
For the purpose of the questions raised in these actions, both may be treated as one.
Thayer and Flagg being out of the. controversy, the real dispute is betweeen the plaintiffs in the second suit representing the estate of Griffin, and those deriving title through him and other owners on the north side of Stuyvesant street, on the one side, and Nott on the other; and the point at issue is, whether the parties are concluded by the line of Stuyvesant street extended to Tompkins street, which forms 'the southern boundary, in the grant of August, 1825, to Flack and Gouverneur, under whom those plaintiffs claim, and the northern boundary of the grant to Bradford, of the 22d of June, 1848, under whom Nott claims; or whether, notwithstanding those grants, those plaintiffs and others on the north of that line are now entitled to have new grants from the Corporation, by lines extended in the direction of the streets, as laid out upon the commissioner’s map, under the Act of1807, and now actually opened. Such lines would cross Stuyvesant street and Nott’s premises diagonally, and the parties thus interested claim the right to go by these lines, not only to Tompkins street, but as much further as the Corporation have established or may establish a new exterior line. Such new grants are claimed by them as a matter of right, and they insist that the grant to Bradford, so far as it interferes with such an extension, is inoperative and void. The plaintiffs’ title (in the 2d suit) extends from the middle of 17th to the middle of 19th street only. The other owners, north of Stuyvesant street, claim title to the residue of the cove, as far as 23d street.
If the controversy terminated at Tompkins street, it would, by reason of Thayer and Flagg’s withdrawal, cease to be of any very *56 great practical importance, as respects Nott's interests, since, up to that line, all that the estate of Griffin—the only other party, except Thayer and Flagg, who, by an extension of their grants in the direction of the streets, would encroach on Nott—could claim, south of Stuyvesant street, would be two small gores; extended, however, beyond that street to Avenue D, the exterior line recently adopted by the Corporation, their claim would embrace all of two blocks, which, with the water front, would be lost to them, and gained by Nott, if Stuyvesant street continued is still to be the dividing line.
The case, therefore, involves not only the question of the propriety of Stuyvesant street as a division line between the two grants up to Tompkins street, but that of its extension as a continuing division beyond that street, in case of new grants.
The consideration of the latter question, however, in the view which I have taken of the case, will become unnecessary.
As between the claimants on both sides of Stuyvesant street and the Corporation, it may be remarked, that both the grants to Bradford on the south side, and to Flack and Gouverneur on the north side of that street, were made to them respectively while they were, in fact, owners of the upland, through title derived from the Stuyvesants; and if the grants were made by proper lines and boundaries, as between all parties who might, at the time they were made, be affected thereby on either side of Stuyvesant street—or, if not made by proper lines and boundaries, still, if such parties or their grantees are concluded by those conveyances, or are estopped by acquiescence or otherwise—there is an end of all controversy in the case, in respect to the rights of the parties, up to the line of Tompkins street.
The grant to Flack and Gouverneur covered the entire portion of the cove between Stuyvesant street and 23d street, Tompkins street and the shore, while that to Bradford extended over all that portion of the cove between Stuyvesant street and 14th street, except that covered by the grant to Midiólas W. Stuyvesant of 1810, the title to which was already in Bradford. The portion of the cove south of 14th street, and between it and 13th street, was owned by Mott, under a distinct grant.
Nott still retains his ownership, but numerous parties have derived title under Flack and Gouverneur, in severalty or in common, *57 in sections varying from a block to two blocks in width; and it is a matter of moment to them, to establish some principle by which each may secure to himself as large a share as practicable on the exterior line of the city. This can be done in no way so surely and conveniently as by repudiating the principle upon which the grants were originally made, and claiming the lines of the streets bounding their blocks, extended to the outer line, as the true lines by which the grants should have been and ought still to be made.
Such a rule of division would, in consequence of the direction of the streets, deprive Nott, had Thayer and Flagg remained parties to the controversy, of the larger portion of his lands within the cove, and of his front in Tompkins street; and it was in consequence of an attempt, by Thayer and Flagg, to procure a grant from the Corporation on this principle, overriding the former grant to Bradford, that the first of these actions was commenced by Nott, enjoining the action of the Common Council.
In the first suit, Nott claims that, as having Succeeded to the rights of Neziah Bliss, under the deed to him from Nicholas W. Stuyvesant, of the 1st day of September, 1832, by which the upland and the land under water embraced in the grant to Nicholas W. Stuyvesant of 1810, was conveyed, to the extent at least of the 400 feet by the Corporation, and as having also'succeeded to Bradford’s title, he is entitled, as owner of the adjoining premises, to all the lands under water, and to a grant thereof in front of his premises out to Avenue D, the exterior line adopted by the Corporation in 1850, 'with Stuyvesant street extended as his northerly boundary; that this street, so extended, is the natural and proper division line between himself and the grantees of Flack and Gouverneur, both in respect to the old grants and any new ones which the Corporation may make; that these grantees and himself stand in the same legal relation to each other, in respect to their rights in the property, in which Peter G. Stuyvesant, under whom they claim, and Nicholas W. Stuyvesant, under whom he claims, stood to each other while they were the owners of the premises; that the Corporation have not and could not, by any subsequent changes of the streets, extend or abridge the rights of either of the parties; that he (Nott) has expended over $150,000 for the said land, and in filling up and improving the same, in the confidence that he was entitled to all *58 the water rights south of Stuyvesant street, continued to the exterior streets, and down as far south as 15th street—and he insists that Flack and Grouverneur received, in their grant from the ' Corporation, all that they were entitled to as grantees of Peter G. Stuyvesant, and have no title to any grant whatever south of Stuyvesant street.
In the second suit he enlarges his claim, and in his answer insists that Nicholas W. Stuyvesant, under the grant to him of 1810, and by the operation thereof and of the Act of 1826, became seized in fee of the lands between high water-mark and Tompkins street on the east, and between a line commencing on the shore, at the centre of Stuyvesant street, to a point at Tompkins street, several hundred feet north of where the centre line of Stuyvesant street continued strikes Tompkins street as a northerly boundary, and a line on the south corresponding therewith and with the southern boundary of said grant; and that thereby, and by the operation of the Acts of 1835 and 1813, (the latter a re-enactment of the Act of 1798,) the said Stuyvesant, his heirs and assigns, became entitled, as new exterior streets should be erected, to fill up the intermediate spaces in front of their premises in Tompkins street, and became the owners of such intermediate spaces.
The plaintiffs in the second suit, and such of the defendants as with them claim under Flack and Grouverneur, insist, on the other hand, that the grant to Bradford was in derogation of their rights as “ adjoining owners,” that is, as owners of the upland, which they contend is the ownership intended by that expression in the Act of 1807; and they claim that they are entitled to have the lines of their water grants extended over the cove, in the direction and within the limits of the street. By this means, they say, each owner will acquire a fair ratable proportion of front on the extended line, commensurate with the breadth of his line on the shore; and they insist that they are not precluded from such claim, by the fact of Flack and Grouverneur having received a grant bounded on Stuyvesant street.
Flack and Gouverneur received their title from Peter G. Stuyvesant and the Corporation, in trust for an association composed of themselves and others, called “ The Stuyvesant Association.”
It is unnecessary to trace the mutations of the title down to the *59 period of the present actions. For all the purposes of this controversy, the stipulation entered between the parties in the second suit, on the 12th day of February, 1852, is sufficient.
By that, it is agreed that the plaintiffs in the second suit, or some of them, are the owners in fee of the several blocks of land, and land covered with water, lying between the First Avenue and Tompkins street, and between 18th and 19th streets, and also of the several blocks of land, and land covered with water, lying between Avenue A and Tompkins street, and 17th and 18th streets, within the limits of the conveyance by Peter G. Stuyvesant to Flack and Gouverneur, and of the grant to them by the Corporation.
In the first suit there is a stipulation, that the estate of Francis Griffin “ is the owner and in the possession of the premises on the East River, between high water line and the eastern exterior street of the city, and extending from 17th street to 19th streetand a similar stipulation in respect to the other owners, north, up to 23d street. This stipulation contains the reservation, that it is not to be construed as an admission that any of said parties are entitled to any grant south of the centre line of Stuyvesant street.
It will be observed that the grant to Nicholas W. Stuyvesant of 1810, and to Flack and Gouverneur of 1825, were both made before the Act of April the 13th, 1826. This act established Tompkins street "as the permanent exterior street,” and provided “ that all grants made and to be made by the said Mayor, etc., shall be construed as rightfully made to extend thereto.”
I agree with the counsel of the plaintiffs, in the second suit, that, according to the true construction of this act, it simply confirms the validity of grants which had been previously made, in terms, to Tompkins street, and that it does not extend to that street grants which it had not in terms undertaken to convey to that extent.
The act, therefore, ratified the grant to Flack and Gouverneur, as a grant to Tompkins street, while it left unaffected the grant to Nicholas W. Stuyvesant of 1810.
The claim of Nott, therefore, to go to Tompkins street under this latter grant, by virtue of the Act of 1826, is unfounded; and he, consequently—in so far as his right depends on an ownership on Tompkins street, derived from the grant of 1810 and the operation of the Act of 1826—has no right to fill up the space inter *60 mediate Tompkins street and Avenue D, and become the owner thereof under the provisions of the Act of 1813, even if it be conceded that Avenue D is properly established as an exterior line, and that the Act of 1813 is applicable to the case.
The Act of 1826 also authorizing future grants to be made to Tompkins street, that to Bradford, under which Nott claims; was rightfully made thus far.
At the time he received this grant, Bradford was the owner of the land conveyed by the grant of 1810 to Nicholas W Stuyvesant, which embraced both the tide-way and the 400 feet belonging to the Corporation. The grant was, therefore, properly made to him as “adjacent owner,” in either aspect of the meaning of the term.
Whether this grant was properly bounded by Stuyvesant street continued as its northerly boundary, is another question, and yet to be considered.
The owners north of Stuyvesant street are not, unless by acquiescence, concluded by the terms of the grant to Nicholas W. Stuyvesant or Bradford, in respect to the boundary by Stuyvesant street, if, as against the Corporation, they had, or now have, a right to have their grants run south of Stuyvesant street; but if, on the other hand, the Corporation had the absolute right, as is claimed by Nott, to grant in any direction they pleased, to the extent of the 400 feet beyond the tide-way, (which is a question to be considered,) no one can question that Nicholas W. Stuyvesant acquired a perfect title, under his grant, to the whole extent of the land embraced within it as far outwardly from the shore as the 400 feet.
So far as Tompkins street is made the exterior boundary line in the grant to Bradford, it must be considered, under the Act of 1826, as “ rightfully made” to that street, but that does not touch the question of the propriety of Stuyvesant street as its northerly boundary.
■ All the parties claim to go beyond Tompkins street, and to have their grants extended to Avenue D, the present exterior line established by ordinance of the Corporation in 1850, under the Act of May the 11th, 1835.
It is proper to dispose of this question in the first instance.
The Judge, at Special Term, decided that the Corporation have *61 no right, under the Act of May the 11th, 1835, to make grants to such exterior line, on the ground, principally, that that act does not, in terms or by implication, convey to the Corporation the fee in the soil under water beyond Tompkins street, nor operate to transfer the title of the State, either to the Corporation or to a grantee under the Corporation.
I coincide substantially in the views expressed by the Judge, at Special Term, on this question, and am clearly of opinion, that no fee is given to the Corporation by implication, as certainly - none is given in terms by the Act of 1835, in the lands under the water, outside of, or to the eastward of Tompkins street, and that, consequently, no grant of such lands made, or to be made by the Corporation, conveys or can convey a fee in such lands to the grantee. I am also further of opinion, that the said act cannot be construed to extend by implication the grants already made, bounding on Tompkins street, to such exterior line. Whether the Corporation have or have not the right, under the Act of 1835, to establish an exterior line to the eastward, or outside of Tompkins street; or whether, by establishing a line conditionally within the line of that street, by their resolution of the 8th day of February, 1833, referred to in the opinion of the Judge, at Special Term, they have exhausted their powers under that act, - I do not deem it necessary to decide.
I come, then, to the consideration of the main question in the cause, to wit: Whether the grants to Bradford and to Flack and Gouverneur are conclusive, on the parties to this controversy, in respect to the line of Stuyvesant street, as the division line between them, down to Tompkins street, either as the line originally proper and equitable to have been adopted, or as adopted and acquiesced in by the grantees in those grants, or as one which the Corporation had the absolute right, in virtue of their ownership in the tide-way, and 400 feet, to adopt.
It is not disputed, by either party, that the Corporation have an absolute fee in the tide-way; but it is contended by the plaintiffs in the second suit, and such of the defendants as have the same interest with them in the question, that, in respect to the 400 feet, they hold it under the Act of 1807, in trust for the owners of the upland, as the parties intended in that act by “ proprietors of the lands adjacent,” and can make no grant of such 400 feet in dero *62 gation of the rights of such owners, even where there has been a grant to a third party of the intermediate tide-way. They claim, that the nature of the ownership of the 400 feet above Corlear’s Hook differs from that below that point, in this respect: That, below that point, the Corporation are vested under the Montgomerie Charter with an unqualified fee in the land; whereas, above it, their title, derived under the Act of 1807, is qualified by the proviso in the 15th section of the act in favor of the proprietors of the adjacent lands, that is, according to their construction, of the riparian owners.
On the other hand, Nott claims that the Corporation became absolute owners of the 400 feet, under the Act of 1807, and held it in trust, only, for the owners of the tide-way—that is, of those to whom they had made grants of the tide-way—and that the riparian owners had no rights whatever in the land under water embraced within the 400 feet; but that the Corporation might grant the same to whom and as they pleased, except only, that where a grant had been made of any portion of the tide-way, such grantee became “ the proprietor of the lands adjacent,” within the meaning of the Act of 1807, and entitled to the pre-emptive right in the land within the 400 feet; and his counsel relies on Furman’s case, (5 Sandf., S. C. Bep., 16,) as settling the question, that, as between the Corporation and the riparian owner, the latter had no rights in the space in question.
That case did undoubtedly decide, that, as between the owner of the shore and the Corporation, the former had no title in respect to the tide-way or the 400 feet beyond, but that the Corporation held the fee in absolute enjoyment, and that the provisions of the section of the Act of 1798, which gave to the proprietors of the lands adjoining or opposite to a new exterior street to be constructed, applied only to those who had obtained grants of the whole 400 feet; but that case, it must be observed, respected lands under water below Corlear’s Hook, and there is no provision in either charter under which the Corporation acquired title to the tide-way, and the 400 feet beyond on that part of the shore, analogous to the proviso in the Act of 1807, giving to adjoining owners a “ pre-emptive right” in grants to be made of the space embraced within the 400 feet.
Apart from that proviso, I admit the rule in Furman’s case *63 would apply equally above as below Corlear’s Hook, but when the Corporation accepted the grant of the 400 feet under the Act of 1807, they accepted it with the condition or proviso in question annexed to it; and if that proviso tended to qualify their absolute ownership of the tide-way in respect to future grants of the 400 feet, they assented to such qualification.
Were it necessary to decide this question in the present case, I should, according to my present convictions, hold to the views entertained by my brother Hoffman at the Special Term, though neither of my brethren at General Term are inclined to agree with me on this point; but the question does not properly arise in the case, nor is it necessary to pass an opinion upon it, since all the three grants—that to Stuyvesant in 1810, and those to Bradford, and Flack and Gouverneur—embraced as well the tide-way as the 400 feet, and were all made at a time when the grantees were in fact the owners of the upland.
The whole question, then, comes to this: By what lines of division or boundary ought the Corporation to have made their grants to Stuyvesant, to Bradford, and to Flack and Gouverneur, respectively ? Was it a matter of right with those parties to have their lines run in any particular direction, and to embrace any given quantity of space, or had the Corporation the absolute right to run the lines in any direction, within the cove, which they might see fit to adopt ? If the Corporation had not such right, but the grantees were entitled, as matter of right, to have their grants made by lines which, as between all the owners of the shore at the time of the grants, would be equitable and just, then were the lines of division actually adopted, in fact, equitable and just as between those owners; and if not, or if they were equitable and just as between the original grantees, but as between the present parties they are not thus equitable—that is, if the grants were now to be made to the present owners, it would be inequitable and unjust to make them by the same boundaries—may the present parties disturb those grants and claim a new division of water lots on a different principle, or are they concluded by the grants already made and under which they claim ?
The argument on behalf of the owners north of the line of Stuyvesant street, and claiming now to go south of it, is, that the grants in question were made at a time when the plan of the city *64 had been settled and fixed, under the Act of 1807 ; that that act manifestly contemplated a general uniform plan of the streets of the city, embracing not only the terra firma, or the'upland, but the land under the water, to the extent of the 400 feet directed by the act to be conveyed to the Corporation by the Commissioners of the Land Office; and that, to effectuate the intent of the statute, it became necessary for the Corporation, in making its grants, to proceed upon some general uniform plan, by which each riparian owner would get his full, fair proportion, according to such plan, on the exterior street; that, practically, the Corporation have always acted on this principle, having in every instance, with the exception of the three in question, made their grants by the lines of the street; that the only practicable mode of executing the statute, between coterminous owners, is to run parallel lines from the points where the boundary lines of the several properties touch the shore to the exterior line, but not necessarily in the direction in which the lines reach the shore; and that the extent of the grant in breadth should be proportionate to the line of ownership on the shore, in consistency with the general plan, and that this object is best secured by adopting the lines of the streets as those of the boundaries of the grants; and they contend that they are not precluded by the grants already made from claiming a new apportionment among all the present proprietors on that principle.
On the other hand, Nott claims that the present parties on both sides stand on this question in the shoes of Peter G. and Nicholas W. Stuyvesant, and that what would have been just and equitable as between them, is just and equitable as between their grantees; and he claims that the line of Stuyvesant street continued, being a continuation of the division line of the upland, was the true, and natural, and equitable line of division in respect to the land under water at the time those grants were made; not because the dividing line had the same direction on the upland, but because in no other way could each of the brothers have obtained his fair proportion of the cove if the whole of it had been divided between them in their lifetime; and he contends that this is most in accordance with the adjudged cases on this subject.
If the Corporation have an absolute right to convey as they please, both in respect to direction and quantity, there remains, of *65 course, no necessity for further discussion, since all parties would be absolutely concluded by the grants already made; but I shall assume, as indeed I have no doubt, that they do not possess such right, but that when grants are to be made, they must be made upon some principle which shall secure to all the shore owners an equitable portion of the exterior line in front.
There is something so extremely plausible, simple and convenient in the rule of division contended for by the owners north of Stuyvesant street, that the. judgment is at first strongly impelled to yield its assent; but a glance at the map and a little reflection will show that its practical effect would be substantially to obliterate the cove, and to give to the proprietors north of Stuyvesant street nearly the whole water-front within the cove; and if the streets had inclined a little more to the west, it would effectually deprive the shore owners south of that street of any portion whatever of the exterior line.
It was said, in O'Donnell v. Kelsey, (4 Sandf. Rep. 202,) that “ the law gives no fixed and certain mode of drawing the boundary line (in case of water grants), but only lays down a general principle which shall govern in such cases, which is, that each riparian proprietor shall receive his ratable share of front on the outer or water line, and that the boundary lines between coterminous proprietors are to be drawn at right angles, or divergent, or convergent to the shore, according to circumstances.”
It would be necessary, in order to carry out the views of the owners north of Stuyvesant street, wholly to ignore this equitable and just principle of law, since its effect would be, from the direction in which the streets run, to give to the northern owners within the cove the whole of the water-front, to the exclusion of some, at least, of the owners of the southern portion of the shore. A rule of which this must or might be the practical effect, cannot, we think, be the true one. However the lines of the streets might be the proper boundaries in grants to be made from a straight shore line, it is very evident it can have no application in. a cove without working an absolute injustice to some of the shore owners, and this could be justified by necessity alone. Certainly, no necessity of such kind exists in the present case.
Then, how does the case stand upon the question of the propriety of Stuyvesant street as the dividing line at the time of the *66 grant of 1810, and upon the lights of the parties under the subsequent grants, and under all the facts of the case.
' Petrus Stuyvesant died in 1805, leaving by his will his lands on the cove to his two sons, Peter O. and Nicholas W., divided by Stuyvesant street, which he had opened through his farm, and which reached the shore, and giving to each about an equal portion of the shore line within the cove.
The first water grant within the cove was made to Nicholas W. Stuyvesant, in 1810. It commenced at high water at the southeast comer of Martha and Stuyvesant streets, and thence ran on a parallel with Stuyvesant street, to a point at some distance beyond the 400 feet then owned by the Corporation. In this grant Stuyvesant covenants to build out one-half of Stuyvesant street to the extent of his grant, and also one-half of Nicholas William street,, a proposed street adjoining him on the south, also the whole of Martha street, another proposed street, which would form his boundary on the shore line, provided said streets should be recognized ‘and laid out as public streets by the commissioners of streets and roads, which, in fact, was never done. The Corporation reserved the right to run streets through the premises granted, and they give to him the right of wharfage in front of the premises so granted to him. In the same deed he conveys to the Corporation (and the grant to him was on the express condition thereof) a lot of 100 feet by 25 feet at the south-west corner of Stuyvesant street and the river, which was to remain for ever for a public landing for the use of the inhabitants of the city, and also, if the Corporation saw fit, to be used for the purpose of a ferry. The grant contains the proviso, that it was only to pass the right which the Corporation could lawfully claim under their charter and laws, but it certainly did convey to "the extent, at least, of the 400 feet, and for a full and adequate consideration, all that the Corporation could lawfully grant, up to the line of Stuyvesant street continued; and that line was evidently adopted as the most natural and proper one, and probably on the sup-position that Stuyvesant street was to be extended into the cove, as it ran parallel to Nicholas William, and other streets then contemplated.
The commissioner’s map had not at this time been filed.
It cannot be denied that this grant was made to Nicholas W. *67 Stuyvesant, while he was owner of the shore; nor can it be denied that the grant is of land under water, in front of his upland.
Was Stuyvesant street continued from the shore an equitable and proper division line, in respect to the land under water, as between him and his brother, Peter G. Stuyvesant," the owner of the shore north of Stuyvesant street, at the time this grant was made ?
This is the first question, and I think it may be answered by another. What would have been an equitable line of division between the two brothers, supposing the Corporation, in 1810, had made a grant to them, jointly or in common, of the entire land under water within the cove, to the extent of the 400 feet ? A glance at the map will show that the line of Stuyvesant street continued would not only have been the most natural line, but that which would give to each, upon any exterior street which might thereafter be run in the general direction of the main shore, the most equal proportion of front; and that to have made the grants by the lines of the streets, as laid down on the commissioners’ map, would have given to Peter G. an almost entire monopoly of the cove, and of the front on the exterior line.
In answer to this, it is said, that as it is manifest that the Legislature, by the Act of 1807, intended a general and uniform plan for the entire city, including lands under water, as well as upland, the rule of apportionment between these brothers in respect to this cove was riot that which would have applied had the cove been situated on a country river, or had a separate town been laid out on the Stuyvesant property in that locality; that in reference to this general plan, the cove itself is to be considered as blotted out, and the rights of the owners on the shore, in respect to the direction of their grants, to be controlled by the general plan of the city.
There is,- unquestionably, a directness, simplicity and convenience in this view of the subject, as already intimated, which disposes of many of the difficulties which invest it; but, for reasons already suggested, its application would have been inequitable as between the two brothers; and if equity is the basis upon which the water front is to be apportioned among co-terminous shore-owners, then this rule, thus contended for, would have been an unsound one.
*68 That the apportionment should be made upon the principle of giving to each shore-owner, an equal, ratable proportion of the front or water line as far as practicable, I think, admits of no dispute ; nor do I perceive upon what principle a contrary rule can be contended for, nor how it can be claimed with reason, that the Corporation ,are under an obligation to make grants by the lines of the streets. It can only be by assuming, as the argument does, that the policy of the Act of 1807 requires it. The policy of that statute is no more affected by the nature, extent or quality of the rights of the shore-owners, than it is by the nature of the rights of proprietorship on the terra firma itself.
The whole question is one of private right, affecting the owners of the property only. The Act, in giving a pre-emptive right to-adjacent owners, neither in terms nor by implication, as I can perceive, undertakes to regulate the manner in which, as between the several owners, that right is to be regulated and made effectual. Its policy was a public one merely, and was fully answered and secured when the general plan itself was adopted by the commissioners. Ho rule which the Corporation might adopt in making water grants, however inconvenient to the grantees, could in any degree compromise this general plan.
If, then, Stuyvesant street continued would have been a proper " boundary, as between the brothers in 1810, had the whole cove then been divided between them, how does the case stand as respects the present parties in interest, who derived title to the upland through the brothers, in respect to their rights under the subsequent water grants ?
Peter G. Stuyvesant was, at the time of the grant of 1810, the owner of the whole shore within the cove north of Stuyvesant street, and it is difficult to imagine that he should have been unacquainted with the grant to his brother.
He remained such owner until 1825, fifteen years after the grant to his brother, when he conveyed all his upland to Flack and Gouverneur, bounded southerly “by a piece of ground heretofore called Stuyvesant street,” “together with whatever water right the said Peter G. Stuyvesant was entitled to, appertaining to said land.”
Within a few months after this conveyance, Flack and Gouverneur applied to and obtained from the Corporation their water *69 grant of August the 1st, 1825, bounded “ southwardly by the continuation of a line drawn through the middle of Stuyvesant street, and extending to Tompkins street, then the exterior line of the city, established by law.” The grantees covenant to make streets through the premises, as laid down on Ewen’s map, (and which correspond with the present streets,) including Tompkins street, and are to receive the wharfage from Tompkins street, etc.
If the water right conveyed by the deed of Peter G. Stuyvesant embraced a right to a grant by a line of the streets, such right existed then to as full an extent as it does now, and Flack and Gouverneur knew it. There is no evidence that they then asserted any such right, or made any claim upon the Corporation for a grant upon any such principle. On the contrary, they have no sooner received their deed from Stuyvesant than they apply to and receive from the Corporation a grant, bounded by Stuyvesant street, not only to the extent of the grant of 1810, but to the whole extent of that street as continued to Tompkins street, then the established exterior line of the city; and they covenant, in their grant, to construct the streets which run through the premises as laid down on Ewen’s map, (corresponding with the present streets, including Tompkins street,) and are secured by the grant in the receipt of the wharfage on Tompkins street.
The Judge below has not found, nor does the evidence show, what was the condition at this time of the property south of Stuyvesant street, in regard to improvement.
It is contended, however, by the plaintiffs in the second suit, that there is no evidence in the case to show that Peter G. Stuyvesant, or those claiming under him, ever acquiesced in the boundary of the grant of 1810 to Nicholas W. Stuyvesant, or that they ever knew of the existence of such grant; that it is not found, as a fact in the case, that they ever acquiesced in the lines of that grant; and that the acceptance of their own grant by Flack and Gouverneur, with Stuyvesant street as its southerly boundary, is no proof that they intended to acquiesce in that line as the proper southerly boundary of their grant, but that, for aught that appears, they took what was offered to them, or all that they could then get, intending, as their grantees now do, to insist upon a further grant up to the line of 15th street; and that, even if they did know, when they took their grant, of the existence of the grant of 1810, they had a right *70 to claim more; and that the acceptance of a grant which did not give them all their rights, could not preclude them from after-: wards demanding a further grant, to the whole extent of their legal right.
Unless those plaintiffs have the absolute legal right which they claim, to run their grants by the lines of the streets, as laid down on the commissioner’s map, the whole of this argument fails. That they have not such a right has already been asserted, and is, I think, clear.
The line of the streets, as a boundary, is one of equitable propriety only, and not of right; and if it was equitable and proper in the Corporation to make the grant to Nicholas W. Stuyvesant of 1810, by the lines they did, then Nicholas W. Stuyvesant acquired, as against the shore-owners north of Stuyvesant street, a title, under that grant, which those-owners could , not afterwards disturb.
It is true that the Judge has not found, as a fact, that Peter G. Stuyvesant knew of the grant of 1810, or acquiesced in the line of Stuyvesant street as its proper northern boundary; but, apart from the inherent difficulty of supposing him to have continued ignorant of it for 15 years, I do not think the question depends on the doctrine of acquiescence. Such doctrine supposes an erroneous line, and assumes an absolute right, originally, on the part of the acquiescing party, to go by a different line. Such right, as I have repeatedly said, does not exist; and the question, whether the line be or be not erroneous, is the very point in dispute.
• The true question is, whether that line was equitable and just, as between the brothers, at "the time of the grant of 1810; and whether the same line, continued to Tompkins street, would not have been an equitable and just one, had the whole cove then been divided between them; and whether, by accepting a grant with such line continued as an actual southern boundary, Flack and Gouverneur did not recognize or adopt that line as the true, proper and equitable boundary between them and Nicholas W. Stuyvesant, or those who might claim under him south of that line. The grant to Flack and Gouverneur was made immediately after they acquired title to the shore, by the deed of Peter G. Stuyvesant—they succeeded to, and immediately acted upon, his supposed rights in the land under water within the cove. His *71 deed expressly conveyed to them such water rights as appertained to the land conveyed; as they made no delay in applying for a grant, it is not to be supposed that they applied for a less quantity than they supposed themselves entitled to. Undoubtedly, they asked and obtained all they then thought themselves entitled to have, and, as I have shown, all that it would have been reasonable, equitable or proper for Peter G. Stuyvesant to have asked for and obtained, had he never conveyed to Flack and Grouverneur; they evidently considered themselves as standing in his shoes, and entitled only to the extent to which he was entitled.
If they had, at the time they received their grant, any idea of a right to go south of Stuyvesant street, (and they must be held to have known the full extent of their legal rights,) this was, certainly, the time to have asserted it.
I do not say, that, if such a right existed, they were barred by an adverse possession, on the part of Nicholas W. Stuyvesant, of 15 years only; but I do say, that, not asserting such a right, is conclusive evidence that they did not pretend they were entitled to it, and that they must be held to have taken the line of Stuyvesant street as the proper equitable line of division between them and Nicholas W. Stuyvesant, at least to the extent of the grant to the latter, if not all the way to Tompkins street.
That Flack and Gouverneur did not assert a claim to go south of Stuyvesant street, at the time they applied for and received their grant, in 1825, must be assumed as an undisputed fact, there not being a particle of evidence to show it, nor did they assert any such claim, at any time, before the deed of Stuyvesant to Bliss, in 1832 ; nor did they, in fact, assert a right to such a grant, until, the commencement of this action, in 1852—a period of 27 years from the date of their own grant, in 1825.
In the mean time, the parties claiming under Bliss have applied for said grants, in conformity with the line adopted in the deed of Stuyvesant to Bliss, and have expended large sums in the improvement of the property, which it is not to be presumed they would have done, had they known of any such adverse claim as is now set up by the owners, north of Stuyvesant street.
It is, I think, impossible to resist the conclusion, that a line of division, not disputed by Peter G. Stuyvesant for 15 years, nor *72 by his grantees for 27 years longer—42 years in all—was considered by those parties as an equitable and proper division between themselves and Nicholas W. Stuyvesant, and those claiming under him, south of Stuyvesant street, and was adopted by them as such equitable division, and that it would now be most inequitable to disturb it.
One other question remains to be disposed of: Dr. Nott claims, that, as an owner fronting on Tompkins street, he is entitled, under the provisions of the Act of 1813, (being a re-enactment of the Act of 1798,) to fill up, and become the owner in fee of the lands under water, in front of his premises, and between Tompkins street and Avenue D, the said line or street adopted by the Corporation in 1850, as the exterior street, in lieu of Tompkins street, under the provisions of the Act of 1835.
If the Act of 1813 applies to this case, it would be necessary, in order to determine this question, to consider whether the Corporation had the right, in establishing an exterior line in lieu of Tompkins street, under the Act of 1835, to go outside of, or to the eastward of that street; but, in my judgment, the Act of 1813 has no application. Its true construction was judicially settled in Furman’s case; that provision of the Act, now in question, was intended to obviate a difficulty which this case does not present. The petition of the Common Council, on which the Act was •passed, and the preamble of the Act itself, fully show and explain its intent and purpose. In asking for authority from the Legislature to construct exterior streets, on both rivers, of 70 feet in width, at the expense of their grantees of the 400 feet, the Common Council were met with the difficulty, that, by reason of the sinuosities of the shore, some of the grants would not reach to the line of the proposed new street, which was to be on a straight -line—the fee of the intermediate space being in the State. The provision in question was inserted in the Act, in order, not only that the Corporation might compel that class' of their grantees to aid in the construction of the streets, but that such owners, on complying with the requisitions of the Common Council, might themselves acquire the fee in the land thus owned by the State.
The Act is recited at length in Furman’s case. (5 Sandf. S. 0. Rep., p. 22, etc.)
Provision is also made in said Act for the lengthening and ex *73 tension, of said streets from time to time, and the like provision, as to filling up intermediate spaces, applied also, in cases of such extensions, where the like reason exists; but we think it would be quite too liberal a construction of the Act to hold, that, by the mere fact of the substitution of a new exterior street outside of Tompkins street, if that might lawfully be done, the owners fronting on the latter street acquired thereby, under the Act of 1813, the right to fill the intermediate space, and acquired the title of the State therein. I think the Legislature, in passing the Act in question, contemplated no such case, but that its application should be confined strictly to the cases specified in the preamble of the Act, to wit: those of parties whose grants, “ from the curving and irregularities of the shores of the rivers in their original state,” though extending to the whole length of the 400 feet, do not reach the line of one of the old exterior streets, about to be lengthened or extended to the line of a new proposed exterior street, if, indeed, the Act applies to the latter case, which may be doubtful. I am, therefore, of opinion that this claim of Dr. Nott cannot be sustained.
As the judgment at Special Term, in some respects, differs from the views herein contained, it must be modified in those particulars, and in others affirmed.
The conclusions, in which the Judges before whom these appeals were argued all concurred, were as follows :—
First.—The line of Stuyvesant street, continued to Tompkins street, would have formed the proper, natural and equitable boundary, as between Nicholas W. and Peter G. Stuyvesant, had the Corporation undertaken to make grants to them of the space within the cove, upon the principle of an equitable division between them in respect to their ownership on the shore, assuming either that, by virtue of such ownership of the upland, they were entitled, under the Act of 1807, to claim and have such grants, or that the Corporation were willing to concede to them such a right, and this, notwithstanding that, according to the plan of the city adopted by the commissioners under that Act, the streets as laid out by them, if continued into the cove, would have followed lines running in a different direction.
And such line of Stuyvesant street formed a proper northerly *74 boundary in the grant to Nicholas W. Stuyvesant of 1810, as between him and his brother, at the time the same was made.
Second.-—The same hue of division was equally equitable and proper as between Flack and Gouverneur, on the one side, and Bradford on the other, as parties succeeding to the title and rights of the Stuyvesants, respectively, at the time those grants were made; and the plaintiff, Nott, as succeeding to Bradford’s title, is entitled to claim, as against the parties to the suits who have succeeded to Flack and Gouverneur, that Stuyvesant street, thus continued, and constituting the actual boundary between their respective grants, is the true, proper and equitable line by which those grants, respectively, ought to have been made.
Third.—However true it may be, that the hues or direction of the streets continued may form the most convenient, and, under certain circumstances, a proper basis upon which to make water grants, that, still, this is a matter of mere convenience, and that this alone creates no rule of obligation on the Corporation, nor one that gives to the parties entitled to or claiming grants an absolute right, as against the Corporation, or as against each other, to have'them run by such lines. That the question, as between coterminous owners of the shore-line, is always one of equitable apportionment of the space to which the grants are to apply, and that the exact lines of division must necessarily depend upon the relative directions of the shore-line and of the exterior line to which it is intended the grants shall extend.
Fourth.—Without deciding, or intending to express an opinion, whether the Corporation, under the Act of May the 11th, 1835, (providing for the designation, etc., of a permanent exterior line,) may or may not lawfully project or lay out a new exterior line or street to the eastward, or outside of Tompkins street, or whether, if they once have adopted a line within Tompkins street as such new exterior line, they have thereby exhausted all their power under said Act, we are of opinion that no fee is given to the Corporation by implication, as certainly none is given in terms, by the Act of 1835, in the lands under water outside of, or to the eastward of Tompkins street, and that, consequently, no grant of such lands made, or to be made by the Corporation, conveys, or can convey a fee in such lands to the grantee.
We are further of opinion, that the Act cannot be construed to *75 extend, by implication the grants already made, bounding on Tompkins street, to an exterior line or street outside of Tompkins street.
Fifth.—The parties to the suit, whose grants bound on Tompkins street, have no right, actual or pre-emptive, to grants outside of, or beyond that street; nor have they any right or title, derived from the Act of 1885, in the land under water between that street and Avenue D, the exterior line recently adopted^ nor have they, as adjacent owners, a right to fill in such intermediate space, and become the proprietors thereof, under the provisions of the Act of 1813.
Sixth.-^The parties are concluded by the grants already made as to Stuyvesant street, as the dividing line between the parties claiming adversely to each other in these actions, such line being also an equitable and proper one; and the claim of the plaintiffs in the second suit, and the other owners to the north of that street, cannot be sustained.
Seventh.—The judgment at Special Term must be modified in the particulars in which it does not conform to the principles of this decision:
No costs of appeal to either party.
Judgment accordingly.